**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHARLES ALVIN CHANEY, JR.,     )
         Plaintiff         )
                    )   No. 1:19-cv-00005 (Erie)
     v.              )
                    )
CO R.M. BEDNARD, et al.,      )   Richard A. Lanzillo
         Defendants     )   United States Magistrate Judge
                    )

## MEMORANDUM OPINION AND ORDER

I.      Introduction

Plaintiff Charles Alvin Chaney, Jr. (Chaney) filed this *pro se* action against seven individuals employed by the Pennsylvania Department of Corrections (DOC) at the State Correctional Institution at Albion (SCI-Albion): Corrections Officer Bednaro, Sergeant Clinger, Corrections Officer Borello, Corrections Officer Bornsheuer, Lieutenant Barner, Corrections Officer Boyd, and Corrections Officer Seeley.[1]  ECF No. 4.  Chaney alleges that while he was incarcerated at SCI-Albion on May 15, 2018, the Defendants used excessive force against him in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  *Id.*, pp. 2-3.  The Defendants have filed a Motion for Summary Judgment, arguing that Chaney failed to identify them by name in his initial grievance and therefore did not properly exhaust his administrative remedies through the prison grievance system as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e.  ECF No. 4, ¶¶ 9-10.  They also argue that the force used to control him on May 15, 2018 was reasonable and appropriate.

---

[1] Based upon records produced in connection with the pending motion for summary judgment, it appears that Chaney's Complaint misspelled the last names of several Defendants.  The correct spellings are used in this Opinion and Order.

For the following reasons, the Court finds that SCI-Albion personnel excused Chaney's procedural default against all Defendants except Seeley and, therefore, except as to Seeley, his claims are not barred by the PLRA.  However, based upon the video and audio record, the Court also holds that a reasonable jury could not find that the force used by corrections officers on May 15, 2018 was excessive or unreasonable under the circumstances faced by them.  Therefore, the record does not support a triable issue of material fact, and the Defendants are entitled to judgment as a matter of law, on Chaney's excessive force claim.[2]

II.      Background

A.   Procedural History

Chaney's Complaint was docketed with this Court on February 12, 2019.  ECF No. 4.  The Defendants filed their Answer on June 11, 2019.  ECF No. 19.  Chaney filed a motion to amend his complaint on August 14, 2019, seeking to add three new defendants.[3]  ECF No. 25.  The Court denied this motion without prejudice because Chaney failed to include a proposed amended complaint as required by Third Circuit law.  *See Fletcher-Harlee Corp., v. Pote Concrete Contractors, Inc.* 482 F.3d 247 (3d Cir. 2007); ECF No. 26.  Although the Court's order was without prejudice, Chaney did not renew his motion or otherwise produce a proposed amended complaint.  Accordingly, his original Complaint at ECF No. 4 remains his operative pleading.[4]  Chaney later filed an affidavit—

---

[2] The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636.  *See* ECF Nos. 17, 21.

[3] Chaney proposed adding the Pennsylvania Department of Corrections, DOC Secretary John Wetzel, and SCI-Albion Facility Manager Michael Clark as Defendants.  ECF No. 25.

[4] The Defendants filed an Amended Answer to the Complaint on December 17, 2019, which made no substantive change to Defendants' original Answer.  ECF No. 36.

titled "Narrative Statement"—which provides more detailed allegations regarding the events of May 15, 2018 upon which he bases his claim.[5]  ECF No. 38.

On March 5, 2020, the Defendants filed their Motion for Summary Judgment and a brief in support of the motion.  ECF Nos. 43, 44.  Thereafter, on March 23, 2020, the Defendants filed their Concise Statement of Material Facts.  ECF No. 52.  Chaney filed a document titled "Objections," presumably in response to the Motion for Summary Judgment, on March 18, 2020.[6]  ECF No. 47. He filed his own Concise Statement of Material Facts on April 8, 2020.  ECF No. 53.  It does not respond point-by-point to the Defendants' Concise Statement of Material Facts, but instead provides a two-page narrative of Chaney's version of events.  Chaney also filed a Brief in Opposition to the Motion for Summary Judgment and a Statement of Disputed Factual Issues along with numerous attachments.  ECF Nos. 55, 57.  The Defendants filed a Response to the Plaintiff's Statement of Disputed Factual Issues on May 19, 2020.  ECF No. 59.  Chaney then filed a "Rebuttal" to the Defendants' Response on May 26, 2020.  ECF No. 60.  The motion is fully briefed and ready for disposition.

B.   Chaney's Allegations and the Composition of the Record

Chaney's claim arose from an incident at SCI-Albion on May 15, 2018.  Chaney's initial grievance alleged that several corrections officers assaulted him, made threats of a sexual nature, and used racial epithets against him.  ECF No. 44-2, p. 22.  In his Complaint, he alleged that he was "thrown violently to the ground" and that Sgt. Clinger used a taser on his right leg while he was

---

[5] Chaney's affidavit—titled "NARRATIVE STATEMENT"—begins with, "In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing [sic] is true and correct."  ECF No. 38., p. 1.  The Court is satisfied that this complies with the requirements of 28 U.S.C. § 1746 for the use of unsworn affidavits in federal court.

[6] Chaney's "Objections" conclude, "Charles Alvin Chaney JR hereby declares under penalty of perjury that the foregoing is true and correct to the Best of my knowledge."  ECF No. 47, p. 3.  The Court is satisfied that this complies with the requirements of 28 U.S.C. § 1746 for the use of unsworn affidavits in federal court.

restrained.  He also asserts that Corrections Officer Borello punched him in his right eye, kneed him in the same eye, and attempted to punch him in the same eye a second time. [7]  ECF No. 4, pp. 2-3.

The record includes four video recordings of the incident.  ECF No. 42.  Two discs contain video recorded from stationary cameras while the third recorded video is from a handheld camera that followed Chaney and corrections officers throughout the entire use of force incident.  The events captured on videos are described in Section IV (B) of this opinion.  The record also includes the report of an internal investigation, #2018-A-309, which was conducted by Lt. Skinner.  ECF No. 44-2.  This report is comprised of reviews of the four video recordings, two written statements from Chaney, reviews of eight statements from staff involved in the incident, and additional investigative statements.

III.    Standard of Decision

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for

---

[7] Chaney initially claimed that he was also sexually assaulted but later withdrew this assertion.  When interviewed by Lt. Skinner on May 17, 2018, Chaney denied that any sexual threats or statements were made.  ECF No. 44-2, p. 17.  In a statement given on June 1, 2018, Chaney wrote, "at anytime i was not sexual assaulted or threaten by the RHU officer on May 15, 2018."  ECF No. 44-2, p. 21.  He signed the statement, "indicating that it is true and correct."  *Id.*  In an interview, Chaney said he could not explain his initial claim but added that maybe he was angry and wanted to "spice it up."  *Id.*, at 16.  His Complaint in this action includes no claim of sexual assault.  See ECF No. 4.

the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must to go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

IV.     Discussion

A. Exhaustion

1.   Chaney's Grievance #737685 and SCI-Albion's Internal Investigation

Before reaching the merits of Chaney's excessive force claim, the Court must address the Defendants' argument that Chaney failed to exhaust his claims through the prison administrative

grievance system "by not identifying any of the Defendants in his Initial Grievance."  ECF No. 43,
¶ 10.  In support of this defense, the Defendants have produced Chaney's initial, one-page
grievance.  ECF No. 44-2.  As discussed below, the Court finds that although Chaney's failure to
identify the Defendants by name in his grievance constituted a procedural default, prison personnel
excused this default for all but one of the Defendants when they identified six of the seven
Defendants in their internal investigation responding to Chaney's grievance.  Chaney's procedural
default regarding his claim against CO Seeley is unexcused, however, because neither Chaney's
grievance nor the internal investigation report identified him as involved.

Chaney filed his initial Grievance #737685 on May 16, 2018.  ECF No. 44-2, p. 22.  In it, he
complained that several corrections officers assaulted him, made threats of a sexual nature, and used
racial epithets against him.  *Id.*  His grievance did not identify any individual by name.  Immediately
after filing his grievance, Chaney received a "Notice of Investigation" informing him that the prison
would take more time than usual "in order to appropriately investigate and respond to your
allegations of abuse."  ECF No. 57-5, p. 1.  The notice further advised Chaney that the additional
response time was authorized in accordance with DC ADM 001.  *Id.*  Lt. Skinner responded to
Chaney's grievance a little more than three months later, on August 24, 2018.  *Id.*, p. 2.  He rejected
the grievance based upon the results of Investigation #2018-A-309 which he referenced in his
grievance response.  *Id.*  Lt. Skinner's report regarding the investigation identified Sgt. Clinger, CO
Borello, CO Bornsheuer, Lt. Barner, CO Bednaro, and CO Boyd as having some involvement in the
use of force incident or related actions on May 15, 2018.  ECF No. 44-2.  Chaney appealed the
denial of his grievance to the Facility Manager, who also denied the appeal based upon Investigation
#2018-A-309.  ECF No. 57-5, p. 3.  Chaney appealed this denial to the Secretary's Office of Inmate
Grievances & Appeals (SOIGA), which similarly denied his appeal, noting that an internal
investigation took place which had deemed his allegations unfounded.  *Id.*, p. 4.

2.   Proving the Affirmative Defense of Failure to Exhaust Administrative Remedies

Prisoners are subject to the PLRA, which mandates that they exhaust all available administrative remedies before bringing a lawsuit concerning conditions of confinement.  42 U.S.C. § 1997e(a).  This exhaustion requirement applies to all claims relating to prison life that do not implicate the duration of the prisoner's sentence.  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002).  The failure of an inmate to exhaust available administrative remedies is an affirmative defense that the defendant must plead and prove.  *Jones v. Bock*, 549 U.S. 199, 216, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (citing *Ray v. Kertes*, [*Ray I*] 285 F.3d 287, 295 (3d Cir. 2002)).  To establish this affirmative defense at the summary judgment stage, the moving party must produce a record demonstrating his entitlement to judgment on the defense as a matter of law.  Fed. R. Civ. P. 56(c)(1)(A).  The most efficacious means to do so is for the defendant to produce the plaintiff's entire grievance record.  *See, e.g., Green v. Maxa*, 2019 WL 1207535, at *6 (W.D. Pa. Mar. 14, 2019); *Jackson v. Superintendent Greene SCI*, 671 Fed. Appx. 23, 24 (3d Cir. 2016).  Defendants may also provide an affidavit from a person with knowledge who affirms factually that the plaintiff failed to fully or properly exhaust.  *See* Fed. R. Civ. Pro. 56(c)(4).  This is often an affidavit from a records custodian.  *See Wiggins v. Correct Care Solutions, LLC*, 2017 WL 11550519, at *5, 7-8 (E.D. Pa. May 9, 2017); *Muhammad v. Sec'y Pa. Dep't of Corrs.*, 621 Fed. Appx. 725, 727 (3d Cir. 2015) (affidavit attesting plaintiff failed to appeal to SOIGA); *accord Martin v. Pa. Dep't of Corrs.*, 395 Fed. Appx. 885, 886 (3d Cir. 2010) (affidavit stating plaintiff "never sought final review").  Defendants may not prevail on summary judgment, however, where they rely upon an affidavit that amounts only to a legal conclusion that the plaintiff failed to exhaust.  *See Ray v. Kertes*, [*Ray II*] 130 Fed. Appx. 541, 543 (3d Cir. 2005) (rejecting summary judgment when SOIGA records custodian's declaration merely recites legal conclusions "mirroring the statutory language" and does not provide a factual report detailing the plaintiff's exhaustion efforts or lack thereof).

Once a defendant properly raises exhaustion, the district court must consider it as a threshold matter. *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 304-05 (3d Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)); *Rinaldi v. United States*, 904 F.3d at 265. The exhaustion requirement is not a mere technicality. It is a federal law that federal district courts are required to enforce. *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000).

Here, the Defendants did not support their motion with Chaney's entire grievance record. Instead they submitted only one page from that record—Inmate Grievance #737685. ECF No. 44-2, pp. 22. The Court recognizes that the Defendants base their exhaustion defense solely on Chaney's failure to identify them in his grievance. Nevertheless, the better practice would have been to produce the balance of the grievance record, including the responses to the grievance. These portions of the grievance record are relevant to whether a plaintiff's failure to specifically name defendants in his grievance is fatal to his claims. *See infra*, pp. 10-11.

Ultimately, the Court must reject the exhaustion defense as to all Defendants except Seeley. This is based upon SCI-Albion's internal investigation, which is part of the summary judgment record and demonstrates that prison personnel excused Chaney's procedural default as to all Defendants except Seeley. This is examined below.

3. Proper Exhaustion Under the PLRA

The PLRA requires proper exhaustion, meaning that an inmate must "complete the administrative review process in accordance with the applicable procedural rules." *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford*, 548 U.S. at 88, 126 S. Ct. 2378). These procedural rules are supplied by the individual prisons. *Jones*, 549 U.S. at 218, 127 S. Ct. 910; *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004) (determining whether "a prisoner has 'properly' exhausted a claim ... is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"). "Compliance with prison grievance

procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 107 U.S. at 217, 127 S. Ct. 910.

For inmates in the custody of the Pennsylvania Department of Corrections, DC-ADM 804 provides the relevant grievance procedures. The DC-ADM 804 grievance system consists of three separate stages. First, within fifteen days of the incident, the prisoner is required to submit a written grievance for review by the facility manager or the regional grievance coordinator, who responds in writing within ten business days. Second, if the grievance is denied, the inmate must submit a written appeal to intermediate review within ten working days, and again the inmate receives a written response within ten working days. Finally, if the inmate remains dissatisfied following this second level outcome, he must submit an appeal to the Central Office Review Committee within fifteen working days, and the inmate will receive a final determination in writing within thirty days. *See Booth v. Churner*, 206 F.3d 289, 293 n. 2 (3d Cir. 1997), *aff'd* 532 U.S. 731 (2001).

The PLRA itself does not have a "name all defendants" requirement. *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) (citing *Jones*, 549 U.S. at 217, 127 S. Ct. 910). But Section 11(d) of the DOC's grievance policy states that the inmate "shall identify individuals directly involved in the events." *See Green v. Maxa*, 2020 WL 1249205, at *5 (W.D. Pa. Mar. 16, 2020); *Jackson v. Carter*, 813 Fed. Appx 820, 823 (3d Cir. 2020). Regarding this requirement, the Court of Appeals for the Third Circuit has held that, "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pa. Dep't of Corr.*, 146 Fed. Appx. 554, 557 (3d Cir. 2005). Such a procedural default can be excused by the prison, however, if prison administrators respond to the grievance "by identifying the unidentified persons and acknowledging that they were fairly within the

compass of the prisoner's grievance." *Spruill*, 372 F.3d at 234-35. Several Third Circuit cases have applied *Spruill* to excuse default when grievance responses acknowledged involvement of the defendants. *See Williams v. Beard*, 482 F.3d 637, 639-40 (3d Cir. 2007); *Robinson v. Johnson*, 343 Fed. Appx. 778, 782 (3d Cir. 2009); *Tenon v. Dreibelbis*, 606 Fed. Appx. 681, 687 n. 5 (3d Cir. 2015). But where the inmate does not identify a defendant in the grievance and there is no indication in the record that prison administrators knew that the defendant was involved in the incident, the prisoner has failed to exhaust his administrative remedies. *Byrd,* 715 F.3d at 127; *Johnson v. Townsend*, 314 Fed. Appx. 436, 442-43 (3d Cir. 2008). The purpose of the stringent standard of proper exhaustion is to alert the prison officials to a problem and allow the officials to remedy the problem before it is litigated in court. *Williams*, 482 F.3d at 640.

A plaintiff's failure to identify individuals in his grievance also may be excused where the prison conducts an internal investigation and relies upon that investigation in its grievance response. *See Martin v. Secretary of Corrections*, 2018 WL 1158250, (M.D. Pa. Mar. 5, 2018). In *Martin*, several defendants argued that the plaintiff had failed to exhaust his administrative remedies with respect to his excessive force claims by failing to name them in his initial grievance. *Id.* at *4. However, the Court concluded that his grievance adequately alerted prison officials to the alleged use of force and that he had adequately explained his failure to name the defendants because he was unconscious during the assault, and thus did not know the identities of those who assaulted him. *Id.* Furthermore, all defendants filed reports that identified themselves as participants in the incident. *Id.* The *Martin* court held that these reports put the prison on notice of the individuals allegedly involved. *Id.* (citing *Spruill*, 372 F.3d at 234). *See also Schultz v. Doher*, 335 F.Supp.3d 177, 185 (D. Mass. 2018) (refusing to grant exhaustion defense on summary judgment when although prisoner's grievance about excessive force did not identify the officers involved, those officers wrote incident reports summarizing the incident). The Third Circuit has also held, citing *Spruill*, that prison officials

acknowledged that individuals "were fairly within the compass of the prisoner's grievance" when their grievance response referenced an informal internal investigation. *See Diaz v. Palakovich*, 448 Fed. Appx. 211, 216 (procedural default against mailroom employees was excused when the grievance response "indicat[ed] that the grievance officer went 'to the Mailroom to discuss the issue with Mailroom staff.'").

Again, "'[t]he primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued.'" *Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007) (quoting *Jones*, 549 U.S. at 219, 127 S. Ct. 910). Thus, a plaintiff's failure to identify defendants by name in a grievance will be excused where prison officials conduct an internal investigation that identifies the individual staff members who were involved in the incident that is the subject of the grievance. That is the case here, except as to Defendant Seeley.

### 4. SCI-Albion Excused Chaney's Procedural Default as to All Defendants Except Seeley.

Although Chaney's initial grievance mentions no one by name, Lt. Skinner's denial of the grievance relied directly on the report of Investigation #2018-A-309, which acknowledged the involvement of each Defendant except Seeley. ECF No. 44-2, p. 1. CO Borello, Sgt. Clinger, CO Bornsheuer, Lt. Barner, CO Bednaro, and CO Boyd are all named in the report and identified in its supporting video recordings and witness statements. Only Defendant Seeley is omitted from the report of the internal investigation. ECF No. 44-2. When Facility Manager Clark upheld Lt. Skinner's grievance denial, he also specifically referenced Investigation #2018-A-309. ECF No. 57-5, p. 3. When SOIGA upheld the grievance's denial, grievance officer Dorina Varner wrote that she "has reviewed all applicable documents" and she too referenced Skinner's internal investigation. ECF No. 57-5, p. 4. Both the Facility Manager and SOIGA upheld this denial on the merits.[8] ECF

---

[8] SOIGA appears to have made a final decision on the merits. Responding to a grievance on its merits also has been held to excuse a procedural default. *See Rinaldi v. United States*, 904 F.3d 257, 271 (3d Cir. 2018) (reaffirming that "when

No. 57-5.  Grievance officers at every level of the Pennsylvania DOC were aware of the internal investigation, had access to its documentation, and thus knew or should have known the identities of the corrections officers involved.

The Third Circuit Court of Appeals' decision in *Byrd v. Shannon*, 715 F.3d 117 (3d Cir. 2013) is also instructive concerning how the exhaustion defense should be applied to each of the Defendants in this case.  In *Byrd*, the inmate plaintiff asserted that the district court erroneously granted summary judgment to a defendant based upon the plaintiff's failure to identify the defendant in his grievance concerning inadequate medical care.  *Byrd*, 715 F.3d at 120, 127.  The Third Circuit affirmed the district court based upon the plaintiff's noncompliance with the DOC's rule requiring grievances to name all individuals involved.  *Id.*, at 127.  The prison administration in *Byrd* was unaware that the unidentified individual was involved in the incident until the plaintiff filed his lawsuit.  *Id.*

In this case, the internal investigation identified all Defendants except Seeley as being involved in the incident at issue.  The prison officials here knew that Chaney was grieving alleged uses of excessive force and, through their internal investigation, "clearly knew [Defendants Borello, Clinger, Boyd, Bednaro, Barner, and Bornsheuer] w[ere] alleged to be implicated."  *Spruill*, 372 F.3d at 234.  Therefore, these six Defendants "were fairly within the compass of the prisoner's grievance."  *Spruill*, 372 F.3d at 234.  In contrast, the record includes no evidence to indicate that prison officials were aware of Seeley's alleged involvement.  Therefore, Chaney's claims against Seeley are procedurally defaulted and unexcused.  *Byrd*, 715 F.3d at 127.  *See also Johnson*, 314 Fed. Appx. at 441-42 (rejecting excusal-of-default argument based on *Spruill* when neither the grievance

---

an inmate's allegations have been fully examined on the merits and at the highest level, they are, in fact, exhausted" (internal quotation marks omitted)).

nor the grievance responses identified the defendants or the claims against them); *Rosa-Diaz v. Dow*, 683 Fed. Appx. 103, 105-06, 106 n. 3 (3d Cir. 2017).

This holding does not suggest that an internal investigation excuses compliance with prison grievance procedures generally. The Supreme Court in *Ross v. Blake* rejected a "special circumstances" exception to the PLRA's exhaustion rules, holding that the PLRA requires that a prisoner must follow the applicable rules laid out in the prison grievance system. ---U.S.---, 136 S. Ct. 1850, 1858-59, 195 L. Ed. 2d 117 (2016). Participating in an internal investigation, without filing a grievance, is insufficient. *Id.* *See also Pavey v. Conley*, 663 F.3d 899, 905 (7th Cir. 2011); *Panaro v. City of N. Las Vegas*, 432 F.3d 949, 953 (9th Cir. 2005) (holding that an internal-affairs investigation is no substitute for an available grievance process); *Thomas v. Woolum*, 337 F.3d 720, 734 (6th Cir.2003) (same), *abrogated on other grounds by Woodford v. Ngo*, 548 U.S. 81, 87, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006). *Ross* does not control here, however, because Chaney filed a grievance. Furthermore, he prosecuted his grievance through the three-steps of the DOC's administrative process during which prison officials themselves relied upon an internal investigation that identified all but one of the Defendants.

In summary, the Court finds that Chaney's procedural default is excused as to Defendants Borello, Clinger, Boyd, Bednaro, Barner, and Bornsheuer, but not as to Seeley. Accordingly, summary judgment on this defense is appropriate for Seeley but not for the remaining six Defendants.

    B. Excessive Force Under the Eighth Amendment

        1. Legal Standard for Eighth Amendment Excessive Force Claims

Chaney alleges that officers used excessive force against him on May 15, 2018. In an excessive force claim, the "core judicial inquiry" is whether "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*,

503 U.S. 1, 6-7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992). A touchstone of the analysis is that the Eighth Amendment prohibits prison officials from unnecessarily and wantonly inflicting pain in a manner that offends "contemporary standards of decency." *See Hudson*, 503 U.S. at 8-9, 112 S. Ct. 995. There are several factors to examine when determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, including: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312 (1986)).

Where the events at issue have been captured on video, the court must consider that evidence in determining whether there is any genuine dispute as to material facts. *See Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court must view the facts in the light depicted by the video. *See id.* (relying on a video recording in assessing summary judgment evidence and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape."). At summary judgment, "where there are video recordings of the incident in question, we need not adopt the non-movant's version of the facts if the recording 'blatantly contradict[s]' the non-movant's version 'so that no reasonable jury could believe it.'" *McDowell v. Sheerer*, 374 Fed. Appx. 288, 291-92 (3d Cir. 2010) c*iting Scott*, 550 U.S. at 380, 127 S. Ct. 1769. If a review of the video "refutes an inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate." *Smalls v. Sassaman*, 2019 WL 4194211, at *8 (M.D. Pa. Sep. 4, 2019) (citing *Tindell v. Beard*, 351 Fed. Appx. 591 (3d Cir. 2009*)). See also McCullon v. Saylor*, 2013 WL 1192778, at *14 (M.D. Pa. Mar. 4, 2013) ("[I]n assessing … claims in a case where an

encounter is captured on videotape we are mindful of the fact that when [the] 'videotape refutes [an

inmate's] assertion that defendant[s] used excessive force,' or when the 'video shows that [an inmate]

did not suffer any physical distress' … we should conclude 'viewing the evidence in the light most

favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and

determine that [defendants] acted maliciously and sadistically,' and may enter summary judgment on

the excessive force claim.") (quoting *Tindell*, 351 Fed. Appx. at 596).

   2.   The Record Evidence

   The video recordings in this case captured the entire use of force incident on May 15, 2018.[9]

ECF No. 42.  The video record is comprised of three discs.  The disc labeled "1 of 3" (Disc 1) is

from a stationary camera mounted in C-Pod of SCI-Albion and contains a single video file.  The disc

labeled "2 of 3" (Disc 2) contains three video files.  The first file is a recording from the same

stationary camera that recorded Disc 1 and is duplicative of Disc 1.  The second file is a recording

from a stationary camera mounted in the "strip cage."  The third file is again a recording from the

stationary C-Pod camera.  The disc labeled "3 of 3" is from a handheld camera and, as discussed

below, provides the clearest detail of the events of May 15, 2018.

   The stationary camera mounted in C-Pod recorded the activity outside Chaney's cell prior to

his removal from the cell.  Disc 1 and the first file of Disc 3 record the following activity.  At times

Chaney can be seen through the window of his cell as he moved about within the cell.  At one point,

---

[9] Chaney argues without support that the Defendants have engaged in spoliation of evidence.  He alleges that the video
evidence was tampered with because of "an unexplained lapse in the camera footage for the time period plaintiff attests
is when he was punched in the eye/face and tased."  ECF No. 60, p. 3.  He also writes that the defendants were
"strategically obstructing the camera's view" and that "it is evident that defendants' aim was to cover up their
orchestrated attack against plaintiff."  *Id.*, p. 4.  Defendants respond that they properly preserved the video and deny any
manipulation of it.  ECF No. 59, ¶ 5.  Although the issue is not properly raised in response to a motion for summary
judgment, the Court finds that there was no spoliation of evidence.  *See* Fed. R. Civ. P. 37(e); *GN Netcom, Inc. v.
Plantronics, Inc.*, 930 F.3d 76 (3d Cir. 2019).  The videos were preserved and provided to Chaney.  They are properly
metered for time, and contain no lapses in footage, breaks or any other indication of manipulation.  No person shown in
the video appears to intentionally block or otherwise obscure activities of prison personnel or Chaney.

Chaney appears to strike his cell door or window with an object, which correction officers identified as a meal tray.  Chaney later acknowledged this activity as a protest to the handling of his food by a corrections officer.  During the subsequent internal investigation, Chaney confirmed that Sgt. Clinger and CO Borello were at his cell door trying to get him to surrender his lunch tray because he was "attempting to try to break out the window."  *Id.*  ECF No. 44-2, p. 18.  While Chaney engaged in this activity, several corrections officers, including that Sgt. Clinger and CO Borello, are recorded moving about C-Pod and immediately outside of Chaney's cell.  At times, corrections officers appear to be conversing with Chaney through his cell door, but the substance of the conversations is not recorded on Disc 1 because the stationary C-Pod camera does not record audio.  Corrections officers are later recorded gathering outside of Chaney's cell in preparation for his removal.  Apparently, pepper spray, also known as oleoresin capsicum spray or OC spray, was used in Chaney's cell at some point during his protest concerning the handling of his food.[10]  Chaney's exposure to the OC spray prompted the decision to remove Chaney from his cell and escort him to the triage area of the medical department in order to have him evaluated and, if necessary, decontaminated.  Prior to Chaney's removal from the cell, multiple correction officers are seen wearing protective gear such as gas masks.  The stationary C-Pod camera ultimately records corrections officers placing handcuffs on Chaney through his cell door, opening his cell door, and then escorting him from his cell through C-Pod to a door leading to the medical department, all without incident.  The recording from the C-Pod camera ends here.

    The most relevant and significant video was recorded by a handheld camera.  This camera consistently recorded video and audio in proximity to Chaney throughout the incident.  The recording from this camera appears on Disc 3 and commences as corrections officers gather to

---

[10] Chaney does not argue that the use of OC spray was excessive or inappropriate; he claims no specific ill effects from its use.

prepare for Chaney's transfer and shortly before he is removed from his cell. Like the stationary C-Pod camera, this camera also recorded Chaney being removed from his cell, handcuffed behind his back, and escorted through C-Pod without incident. This camera continues to record as corrections officers walk Chaney down a hallway and then into the triage area of the medical department. As he walks down the hall and approaches the medical department, Chaney is recorded yelling comments, including "beat my ass," "I don't listen to nobody," and "fuck me up." At this point, two corrections officers walk Chaney into the triage room to a padded gurney where the officers guide him to a seated position. Chaney then asked why he has been taken to the room, and Lt. Barner responded "because we have to have medical check you out" due to exposure to the OC spray. Lt. Barner then exited the room, and COs Bednaro and Borello remained. As Chaney was seated on the gurney, CO Bednaro stood on his right side holding his right upper arm while CO Borello stood on Chaney's left apparently holding his left arm. At this point, Chaney was visibly agitated and extremely vocal, and he became progressively more so during his time in the medical department. He is recorded yelling protests about the handling of his food and making repeated provocative comments. These comments included, "playing with my food, that means war," and "we're definitely going to play." During this time, COs Bednaro and Borello continued to stand on each side of Chaney, each holding one of his arms, but otherwise applying no other force. Chaney then asks COs Bednaro and Borello, "why aren't you doing nothing?" and "do I need to start?"

As Chaney became progressively more agitated, other prison personnel, including a nurse, are recorded entering and exiting the area. Corrections officers are repeatedly heard instructing Chaney to calm down. Lt. Barner then re-entered the room and attempted to engage Chaney in conversation. He advised Chaney that personnel are "just trying to help you" and he is "going to have medical check you out." Lt. Barner also asked Chaney, "Are you suicidal?" Throughout this time, Chaney yelled over Lt. Barner and other prison personnel numerous obscenities. As a nurse

approaches to examine Chaney, he repeatedly called her a "fucking fat white bitch," and stated "fuck that fat ass bitch."

At approximately 7:17 on the video meter,[11] Chaney suddenly lunged forward and attempted to pull away from COs Bednaro and Borello.  They attempted to regain control by pulling Chaney back and rolling him face down on the gurney.  Chaney then yelled obscenities and, "you assaulted me."  At approximately 8:15 on the meter, Chaney yells, "it's war," "this is war, this is war," "fuck me up.  I'm ready to die, bitch."  At approximately 8:37 on the meter, Chaney yells, "this is war," "I'm ready to dance," "fuck me up," "break my arm, bitch," and "punch me in the face," among other provocative comments.  Throughout this time, COs Bednaro and Borello, now joined by CO Bornsheuer, attempted to physically control Chaney.  Although each had a firm grasp on Chaney, no punches or other acts of unnecessary force appear to have been applied to Chaney.  At approximately 10:57, as Chaney was restrained face down on the gurney, CO Borello's arm can be seen placed between Chaney's upper back and neck, but the pressure applied did not interfere with Chaney's continuing to yell obscenities and threats.  At no point did Chaney indicate that the hold of any corrections officer's impaired his ability to breath.

At the same time, Lt. Barner continued his attempts to talk to Chaney.  He asked, "are you going to calm down?"  Chaney continued to yell and physically resist.  "I'm going to kill all you mother fuckers," Chaney added to his obscenities and provocative comments.  A "spit hood" with a mesh top was then placed over Chaney's head and the officers returned him to a seated position.  Lt. Barner instructed Chaney to "relax" and "let medical check you out."  Chaney continued to threaten to kill the corrections officers.

---

[11] The times listed in this Opinion are elapsed times as displayed on the video recording.  These times are not actual military time.

At approximately 10:45, Lt. Barner twice asked Chaney to turn around on the gurney, apparently to allow officers to place shackles on his ankles.  Chaney refused to comply, at which point Lt. Barner instructed officers to return Chaney to a face down position on the gurney and place the shackles on his ankles.  Chaney struggled against this action and again repeatedly yelled, "I'm going to kill you mother fuckers."

At approximately 11:21, as Chaney continued to yell obscenities and threats, Lt. Barner instructed corrections officers to take Chaney to the "strip cage."  Chaney was then walked from the medical department down the hall to just outside another room where corrections officers stood him facing the wall immediately to the left of the door of the room.  Lt. Barner is then heard commenting to another officer about wanting to have medical personnel examine Chaney before he is taken into the room.  This is followed by Lt. Barner again attempting to speak to Chaney, at which point, Chaney yelled, "Get away from me you white mother fuckers, you white sons of bitches, you fucking honkies, you fucking crackers…fuck me up…fucking kill me."

At approximately 13:15, as Chaney is still standing facing the wall and yelling "kill me," he abruptly jerked his head backward and then slammed his face or forehead against the wall.  He then abruptly pushed back against the two corrections officers restraining him.  In response, the two corrections officers took Chaney to the ground and several other officers joined in holding him down.  A couple of officers placed their knees onto Chaney's back and one of his legs.  None of the officers appeared to punch, kick, or otherwise strike Chaney while he is on the ground.  CO Bednaro is repeatedly heard instructing Chaney to "stop resisting."  At some point during this struggle, Sgt. Clinger applied an electronic body immobilization device or "EBID"—a handheld taser—to Chaney's leg.  The use of the EBID appears to have been brief as it is not apparent in the video.

After regaining control of Chaney, the corrections officers lifted him from the ground and carried him headfirst into the room where he is again placed on the ground.[12]  Chaney continued to struggle and yell throughout this process.  Some officers held Chaney on the ground and others used scissors to cut away and remove his prison jumpsuit.  They then placed him in a body-length vest with Velcro fasteners—an anti-suicide smock.  Throughout this process, Chaney continued to yell and threaten to kill the officers, and Lt. Barner calmly told Chaney to "relax" and "we will get you out of here."  At this point, Chaney yelled that someone punched him, although no blows are apparent from the video.  Corrections officers then returned Chaney to a standing position and walked him back to the medical unit.  Blood and swelling are visible around Chaney's forehead and eyes.

Once Chaney was back in the triage area of the medical department, he repeatedly yelled, "he punched me in my head" and that he could not see out of his eye.  Two nurses then attempted to photograph and treat Chaney's injuries, but their efforts were repeatedly frustrated by Chaney's refusal to remain still and stop yelling.  Lt. Barner then instructed officers to remove the spit guard from Chaney's face so long as he agreed not to spit.  At approximately 20:49, a nurse was ultimately able to photograph Chaney's face as a corrections officer held a plastic shield between her and Chaney.  Chaney again began to yell and move about, and, at approximately 24:21, Sgt. Clinger entered the triage room and calmly told Chaney to "calm down so the nurses can come in and assess you."  At this point, Chaney claimed that a corrections officer not only punched him but also kicked him and kneed him in the eye.  At 25:09, after Sgt. Clinger asked Chaney multiple times who hit him over a period of several minutes, Chaney identified the corrections officer wearing glasses (CO

---

[12] In addition to the handheld camera, the stationary camera inside this room also recorded events.  File 2 of Disc 2 records the video and audio from this camera.  However, due to the angle and position of this stationary camera, much of the activity on the floor of the room falls below the perspective of the camera.  Again, the recording from the handheld camera (Disc 3) provides the best evidence of what transpired in the strip cage.

Borello).  Sgt. Clinger then instructed CO Borello to leave the room and for another corrections officer to take his position.  CO Borello immediately complied with this instruction.  Nevertheless, Chaney continued to yell and threaten to kill prison personnel.  Sgt. Clinger repeatedly implored Chaney to calm down so nurses could continue to assess him.  Sgt. Clinger continued to talk with Chaney until 29:49, when the officers apparently determined it was safe for a nurse to return.  A nurse then resumed her examination and treatment of Chaney's facial injuries as corrections officers remained positioned around him.  At approximately 32:01, corrections officers escorted Chaney from the medical department to an isolation cell.  This was recorded by both the handheld camera and stationary camera in C-Pod.  The C-Pod video is the third file of Disc 2.

The internal investigation conducted by SCI-Albion following Chaney's grievance concluded that the use of force throughout the incident was reasonable and appropriate and that Chaney caused the injuries to his own face.  ECF No. 44-2, p. 9.  Chaney disputes both conclusions and asserts that he suffered injuries to more than just his head.  ECF No. 60, p. 3 ("Rebuttal to the Defendants' Response to Plaintiff's Statement of Disputed Facts").  The only evidence in the record concerning Chaney's injuries are a picture of his face and what can be seen in the video. There is no evidence that he sought additional medical care after this incident.  On May 17, 2018, Chaney acknowledged to Lt. Skinner that "he was not denied medical and he was seen and assessed by a nurse."  ECF No. 44-2, p. 17.

### 3.  Excessive Force Analysis

There is no dispute that the officers used force against Chaney.  They deployed OC spray in his cell, restrained him after he lunged forward in the triage room, applied a spit hood, restrained him on the ground after he slammed his head into the wall, carried him into the strip room, removed his clothing with scissors, and generally limited his movements.  Given this, the Court must consider each of the five *Whitley* factors to determine whether that force "was applied in a

good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."
*Hudson*, 503 U.S. at 7, 112 S. Ct. 995.

Regarding the first *Whitley* factor, the videos indisputably establish that corrections officers repeatedly needed to use some level of force throughout their interaction with Chaney on May 15, 2018. Chaney initially refused to comply with the order to return his lunch tray and, by his own admission, was "attempting to [use it to] try to break out the window" of his cell. ECF No. 44-2, p. 18. He continued this activity despite at least two officers' instructions to stop and to return the tray. Chaney's noncompliance prompted the use of OC spray, which was appropriate under the circumstances. *See Gibson v. Flemming*, 2019 WL 8017850, at *8–10 (W.D. Pa. Dec. 2, 2019) (finding need for force when inmate refused to return his meal tray, banged it against the cell's window, and threatened self-harm). While Chaney was in the medical unit and prison personnel were attempting to evaluate his exposure to the OC spray, Chaney lunged abruptly while sitting on the gurney with officers holding him, which necessitated the officers need to regain control of him. This too was an appropriate use of force. *See id.*, at *9 (finding need for force when, inside a strip cell, inmate turned towards the guards and video showed a threat to safety). After officers had escorted Chaney to the area outside the so-called strip cage, Chaney abruptly slammed his head into the wall and pushed back against them. To restrain him and prevent further harm to himself or others, officers appropriately took him to the ground. Once he was removed from the cell, throughout the incident, Chaney repeatedly told the officers "hit me" and "kill me," and he also threatened harm to the officers. Faced with a visibly agitated, erratic and threatening prisoner, and a volatile situation, some use of force was clearly appropriate. No reasonable jury could find otherwise. This factor weighs in favor of summary judgment.

Evaluating the second *Whitley* factor requires the Court to evaluate "the relationship between the need and the amount of force that was used." *Brooks* 204 F.3d at 106. The reasonableness of a

particular use of force must be assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Here, the video and other evidence confirm that the amount of force used throughout the incident was reasonable.

CO Borello initially used OC spray to secure Chaney's compliance after he repeatedly refused to stop striking his meal tray against the window of his cell door and surrender his tray to officers. Chaney has never asserted that CO Borello's use of OC spray was unnecessary or excessive, and the record includes no evidence to support such a finding. The record also reflects that Chaney sustained no undue pain or suffering when CO Borello used the OC spray against him and no lasting effects following its use. Courts have recognized that use of mace-type sprays as constitutionally acceptable under comparable circumstances. *See Banks v. Mozingo*, 423 Fed. Appx. 123, 126 (3d Cir. 2011); *Travillion v. Leon*, 248 Fed. Appx. 353, 354, 356 (3d Cir. 2007); *Jones v. Wetzel*, 2017 WL 4284416, at *8–10 (M.D. Pa. Sept. 27, 2017) (using three bursts of OC spray when removing inmate from cell was reasonable when inmate would not return items from his cell, blocked his cell door, and refused several orders to comply); *Gibson*, 2019 WL 8017850, at *8-9. Following Chaney's exposure to the OC spray, corrections officers promptly escorted him to the medical unit for examination and, if necessary, treatment.

The video evidence shows that once Chaney arrived in the medical unit, CO Borello and CO Bednaro used minimal force to control him as he sat on the padded gurney. Each stood on either side of Chaney with a hand on one of his arms. Maintaining proximity and physical contact with Chaney was facially reasonable given his state of agitation and the nature of his comments. Chaney made numerous statements that can only be understood as seeking a physical altercation with prison personnel. He also made repeated threats of physical harm against corrections officers and was verbally abusive towards medical personnel. Despite Chaney's threats and abusive behavior, Lt.

Barner remained calm and composed and repeatedly counseled Chaney to calm down and allow medical personnel to examine him.  Chaney also repeatedly made comments raising concerns of self-harm.  These comments included, "I'm ready to die, bitch."  Lt. Barner assured Chaney that no one wanted to hurt him and asked Chaney whether he was suicidal, reflecting Lt. Barner's concern for his mental state.

When Chaney abruptly lunged forward, the officers used a reasonable amount of force to position him on his stomach and apply a spit hood on his head and then return him to a seated position.  *See Gibson*, 2019 WL 8017850, at *9.  As Chaney's agitation, resistance and threatening comments continued to escalate, corrections personnel made the decision to move him to a room where personnel would exchange his regular prison jumpsuit for a body-length smock designed to prevent self-harm.  When Chaney slammed his head against the wall, the corrections officers took him to the ground with a reasonable amount of force.  The video shows that the corrections officers faced an emergent and unexpected act of self-harm and resistance.  The video also shows that they did not slam Chaney to the ground as he alleged.  The video does not show any correction officer punching, kicking, or otherwise striking him.  Officers held him down with their arms, and a couple placed their knees on his lower back and legs.  Under the circumstances presented, a jury could not reasonably find that this force was excessive.

Sgt. Clinger's one-time and apparently brief use of an EBID taser on Chaney's right leg was also a reasonable use of force to restrain him.  Courts have repeatedly held that "the use of the stun gun does not prove that the amount of force was excessive."  *Camp v. Brennan*, 54 Fed. Appx. 78, 80 (3d Cir. 2002); *Banks v. Mozingo*, 423 Fed. Appx. 123, 126 (3d Cir. 2011) (no excessive force when defendants used mace when plaintiff prisoner would not submit to handcuffing and then used a taser after plaintiff bit a guard).  *See also Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (holding that a "single use of the taser gun causing a one-time shocking" against a "hostile,

belligerent, and uncooperative" arrestee in order to effectuate the arrest was not excessive force in the totality of the circumstances); *Jasper v. Thalacker*, 999 F.2d 353, 354 (8th Cir. 1993) (using stun gun was a reasonable response when inmate verbally threatened and punched at a guard when done in a good faith effort to restore discipline).  Reviewing a similar situation, the Court of Appeals for the Third Circuit found that corrections officers did not use excessive force when they used an EBID twice in twenty seconds when a prisoner, already forcibly removed from his cell by a group of guards for erratic and threatening behavior, refused to walk through a doorway and pushed off it causing the group to stumble.  *Camp*, 54 Fed. Appx. at 79-80.

Courts have denied summary judgment on excessive force claims when presented with evidence that officers used a taser on a fully restrained and non-threatening inmate.  *Brown v. Beard*, 2011 WL 1085890, at *8, 16 (W.D. Pa. Mar. 21, 2011) (plaintiff's affidavit claimed that while he was secured in a restraint chair and not under video surveillance, "he was shocked with the EBID by Defendant Johnson after he was restrained and incapable of being a threat to anyone.").  *See also Everett v. Nort*, 547 Fed. Appx. 117, 119, 121-22 (3d Cir. 2013) (reversing summary judgment for defendant corrections officers where there was "no evidence that [the plaintiff] was acting violently at the time he was in the restraint chair; he simply refused to open his fist," but officers nonetheless used a taser three times and threatened to break his fingers obtain his fingerprints).  No comparable evidence exists in this case.  To the contrary, the videos show Chaney's threatening comments and resistance to officers' efforts to maintain reasonable control of him.  Sgt. Clinger's one-time use of the EBID came only after Chaney slammed his head against the wall, pushed back against the officers who were standing abreast and behind him, and continued to resist the officers who were attempting to regain control of him on the ground.  No evidence in the record indicates that Sgt. Clinger used the EBID in a sadistic, malicious or punitive manner or for any purpose other than to

regain control of Chaney.  Under these circumstances, no reasonable jury could find that its use was excessive.

Chaney asserts that CO Borello punched and kneed him in the face while he was on the ground.  While neither act appears in the video surveillance recordings, it is possible that such acts may have been unintentionally obscured by the bodies of other corrections officers assisting in the efforts to restrain Chaney.  Even if the Court were to assume that was the case here, it would still find that the force was not excessive.  First, a careful, frame-by-frame review of the video belies a finding that any possible blows were struck aggressively or with significant force.  They show no indication of CO Borello "winding up" or cocking his arm or leg to administer a punch or kick.  If these acts occurred, the evidence nevertheless does not support a finding that they were sadistic, malicious, or punitive.

Whether an officer's striking of a prisoner constitutes excessive force must be evaluated based on the totality of the circumstances.  In *Smith v. Mensinger*, the Third Circuit held that, "[p]unching and kicking someone who is handcuffed behind his back and under the control of at least six prison guards as he is being thrown into cabinets and walls is 'repugnant to the conscience of mankind,' absent the extraordinary circumstances necessary to justify that kind of force."  293 F.3d 641, 649 (3d Cir. 2002) *citing Hudson*, 503 U.S. at 10, 112 S. Ct. 995.   Similarly, in *Martinez v. Jones*, issues of fact precluded summary judgment on an excessive force claim where the plaintiff submitted his own affidavit as well as affidavits from other witnesses attesting that the defendant entered his cell, grabbed his neck, and punched him several times in the eyes and jaw, after which he struck the defendant in self-defense.  2015 WL 12516224, at *14-15 (M.D. Pa. Dec. 11, 2015).  The plaintiff's affidavit further attested that he voluntarily submitted to handcuffing, was tackled to the ground, shackled, kicked, and punched several times.  *Id.*

In contrast, the court in *Bryant v. Vessell* found that excessive force was not used under the totality of the circumstances despite the plaintiff's assertions that prison personnel had punched and kicked and hit him in the eye with handcuffs. 2011 WL 2652137, at *2 (D.N.J. July 6, 2011). There, review of video evidence showed that when the plaintiff refused multiple orders to move cells, an extraction team entered his cell. *Id.*, at *1. They took three minutes to subdue the inmate and restrain him while he cursed at them, was uncooperative, and yelled statements like "this is far from over" and "I've been planning this since day one." *Id.* When an officer told the plaintiff that he would remove his handcuffs if he cooperated, the plaintiff "responded that there would be 'round two' if his handcuffs were removed and that he would 'come out swinging.'" *Id.* The court found that the force used was appropriate because the plaintiff was resistant and uncooperative, threatened violence, and the force stopped once the plaintiff was subdued. *Id.*, at *5. *See also Henry v. Thomas*, 2017 WL 1862314, at *1–5 (E.D. Pa. May 9, 2017) (no excessive force when defendant corrections officer elbowed plaintiff twice in the nose and choked him for five seconds, even though the plaintiff was handcuffed and restrained on the ground by many officers, because this was a proportionate response necessary to restrain the plaintiff when within a minute prior to these acts the plaintiff had argued with the defendant and punched him in the face four times).

Viewed in the totality of the circumstances and in the light of the video evidence, a jury could not reasonably find that CO Borello's actions to gain control of Chaney and restrain him on May 15, 2018 were excessive. Thus, the second *Whitley* factor weighs in favor of summary judgment for all Defendants.

The third *Whitley* factor—"the extent of the injury inflicted"—also favors summary judgment. *Brooks*, 204 F.3d at 106. The Court notes that an issue of fact remains regarding the cause of Chaney's injuries. The only blow the video evidence shows to Chaney's face came from Chaney's own act of striking his head against the wall outside of the strip cage. This evidence

strongly supports that Chaney caused the injuries to his face.  The facial bleeding and swelling are visible shortly after he committed this act of self-harm.  Nevertheless, the Court cannot say as a matter of law that the evidence precludes a finding that one or more of the corrections officers caused his injuries, as Chaney asserts.  However, based upon the limited extent of the injuries sustained by Chaney and the repeated instances that his actions required the corrections officers' intervention, the Court finds that Chaney's facial abrasions and swelling were not serious.  The Court also notes that Chaney did not suffer any injury from the use of the EBID other than a short period of discomfort which cannot be consider material in the injury analysis.  *See Camp*, 54 Fed. Appx. 78.  The same is also true regarding the relatively minor discomfort Chaney may have experienced due to his exposure to the OC spray.  *Gibson*, 2019 WL 8017850, at *8–10; *See Jones*, 2017 WL 4284416, at *8–10 (OC spray-induced asthma attack insufficient injury).  Although Chaney alleges that he suffered other injuries, he has failed to provide any details or evidence to support this allegation.  No other injuries are visible on the videos.  Accordingly, the Court finds that the third *Whitley* factor slightly favors summary judgment.

The fourth *Whitley* factor requires the Court to consider the extent of the threat presented by the inmate to the safety of staff and other inmates as reasonably perceived by the responsible officials based on the facts known to them.  *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009).  In this case, Chaney became progressively more agitated and, at times, volatile throughout the incident.  He repeatedly threatened to kill the corrections officers, and he repeatedly invited a violent confrontation with officers and his own self-harm.  Chaney's behavior was erratic and unpredictable, which necessarily raised the stress and uncertainty faced by the officers.  His actions repeatedly took officers off balance and at times to the ground.  His unpredictable lurching and swaying presented a clear danger to the medical unit staff who were attempting to evaluate and treat him.  This conduct also delayed their ability to attend to his injuries.  Thus, although cuffed and shackled, Chaney's

actions and statements demonstrated that he retained the capacity and willingness to cause serious injury to himself and others.  Therefore, even when the evidence is viewed in the light most favorable to Chaney, the Defendants' responses to the reasonably perceived threat presented by his conduct were not excessive.  This factor also weighs in favor of summary judgment.

The fifth *Whitley* factor the Court must consider is whether the Defendants made "any efforts … to temper the severity of a forceful response."  *Brooks* 204 F.3d at 106.  This factor also supports summary judgment for the Defendants.  The video shows that the officers repeatedly attempted to deescalate the tense situation and avoid or reduce the use of force necessary to control Chaney.  They assured him that they wished him no harm and only wanted him to calm down so that medical personnel could examine and treat him, first for his exposure to the OC spray, and later for his facial injuries.  The officers escalated their force proportionally and only in response to Chaney's aggressive and provocative actions.  This last of the *Whitley* factors weighs decidedly in favor of the Defendants.

V.    Conclusion

In summary, the Court finds that only Defendant Seeley is entitled to summary judgment in his favor based upon the Defendants' PLRA exhaustion defense.  Additionally, all Defendants are entitled to judgment in their favor based upon the insufficiency of the evidence to support a reasonable jury's finding that any of them used excessive force against Chaney on May 15, 2018.  Accordingly, the Court enters the following Order.

ORDER

For the reasons stated in the accompanying Memorandum Opinion, the Defendants' Motion for Summary Judgment [ECF No. 43] is hereby GRANTED.  The Clerk of the Court is directed to enter judgment in favor of the Defendants and against the Plaintiff.

Entered this 31st day of December, 2020.

RICHARD A. LANZILLO
United States Magistrate Judge